UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO TRUCK DRIVERS, HELPERS
AND WAREHOUSE WORKERS UNION
(INDEPENDENT) PENSION FUND, and
JACK STEWART, TRUSTEE,

    Plaintiffs,

        v.

CPC LOGISTICS, INC.,

    Defendant,

CPC LOGISTICS, INC.,

    Counter-Plaintiff,

        v.

CHICAGO TRUCK DRIVERS, HELPERS
AND WAREHOUSE WORKERS UNION
(INDEPENDENT) PENSION FUND,

    Counter-Defendants.

No. 10 C 2314
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This is an appeal of an arbitration award under § 4221 of the Employee Retirement Income Security Act ("ERISA"). The Plaintiffs ("the Fund") were ordered by an Arbitrator Ira F. Jaffe (the "Arbitrator") to reduce its assessment of withdrawal liability of $3,530,405.00 to $2,437,401.30. The issues presented concern the determination of withdrawal liability, which is "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's

assets." *PBGC v. Gray & Co.,* 467 U.S. 717, 725 (1984). For the following reasons, the Fund's motion to vacate or modify the Arbitrator's award is denied.

**I. FACTS**

    A. Overview

The dispute in this case arose from a claim by the Fund for withdrawal liability from Defendant CPC Logistics, Inc. ("CPC"). The claim for withdrawal liability arose pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") which amended ERISA. It was undisputed that CPC or its members were contributing employers to the Fund for many years and permanently withdrew from the Fund as of February 4, 2005. There was also no dispute that withdrawal liability was due as a result of that complete withdrawal. The challenge here was to the amount of the withdrawal liability claimed by the Fund.

Arbitration hearings were held on September 2, 3, and 4, 2009. The Arbitrator issued his opinion and determined that (1) the determination of the withdrawal liability of CPC violated Section 4213 of the Act; (2) the withdrawal liability of CPC was to be redetermined on the basis of application of the Plan Actuary's best estimate (i.e. using the Segal Blend) throughout the period from 1985-2004 (based on the evidence, the redetermined amount is $2,437,401.30); and, (3) the Fund was obligated to apply a $487,500 credit as if that amount had been a partial prepayment of the redetermined amount of withdrawal liability.

There were two basic issues put forth at the arbitration. First, "whether the Fund properly determined the withdrawal liability of the Employer based, in part, upon use of an interest assumption that did not represent the "best estimate of anticipated experience under the plan" of the Plan Actuary, but rather was chosen and directed to be used by the Trustees." The second

involved the application of a $487,500 credit that was due to the Employer as a result of a prior settlement agreement. Only the first issue is before me now.

### B. Calculating Unfunded Vested Benefit Liabilities

The Fund in this case utilizes the statutory presumptive method or "20 pool" method of calculating and collecting withdrawal liability. This method measures the change in the Fund's overall unfunded vested benefit liabilities ("UVBs") from one plan year to the next and then allocates responsibility for each of those pools to employers who have withdrawn based upon the proportion of the withdrawing employer's contributions to the Fund to the total contributions to the Fund in the five year period preceding that pool. Each allocation portion of a pool is reduced by 5% each year that passes thereafter without a withdrawal by the employer.

Section 4213(b) allows funding assumptions and methods when calculating the withdrawal liability of a withdrawn employer, but does not necessarily require the use of such assumptions or methods. The Fund employed Plan Actuaries from the Segal Company to determine the UVBs that would be used in various calculations.

Generally, two reports are generated by a Plan Actuary. The first report sets out calculations required to determine whether employers are funding the Plan at required levels and is called a funding report. As the law requires, the Plan Actuary calculated the unfunded vested benefit UVB for purposes of the funding requirements imposed by the Internal Revenue Code ("Code") Section 412. The second report is called a withdrawal liability report. Both reports contain a calculation of the plan's UVB, and many actuaries use the same assumptions and methods in calculating the UVB for both reports, and as a result, produce the same UVB. The Fund's Actuary, however, did not use the same method to calculate each UVB. Instead, the

3

Actuarial Firm for the Fund used an independent approach when calculating the UVB for withdrawal liability. This method is called the Segal "Blend" approach. The Segal Blend always represented the "best estimate" of the Plan Actuaries with respect to withdrawal liability determinations. The parties do not dispute that the Segal Blend approach yields the "best estimate" with respect to withdrawal liability.

In the wake of the Supreme Court's ruling in *Concrete Pipeline and Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602 (1993), Segal issued a Guidance Memorandum discussing, among other things, whether it was permissible for an actuary to have different numbers for the UVB in the funding and withdrawal liability reports. As a result of this Memorandum, Segal was directed by the Fund's Trustees to modify the steps used to determine the UVB for withdrawal liability. The actuary would calculate the UVB using the Blend assumptions, and then determine the UVB using the funding report assumptions. The latter UVB would set an upper limit for the UVB. In a year where a UVB value was capped, the assumptions used in both the funding report and the withdrawal liability report would be the same. However, the assumptions used to generate this number would *differ from* assumptions that would be used to calculate the Segal Blended UVB which would have served as the "best estimate" for withdrawal liability. In other words, if the UVB calculated for the funding report was lower than the UVB calculated for the withdrawal liability reports using the Segal Blend method, the calculation utilizing the Segal Blend method would be disregarded, and replaced with the funding report UVB (which unutilized different assumptions and methods).

The Trustee's 1997 resolution[1] stated that:

---

[1] The April 1997 resolution was repealed in 2004.

> Effective for all withdrawals occurring after March 31, 1996, the value of unfunded vested benefits or purposes of withdrawal liability shall be based upon the actuarial assumptions and methods that have been established for determining withdrawal liability [the Segal approach], provided that the value of unfunded vested benefits for purposes of withdrawal liability shall not be higher than the value determined based on the actuarial assumptions and asset valuation methods effective for the same plan year that have been adopted for purposes of determining on-going Plan funding in accordance with Internal Revenue Code Section 412.

CPC withdrew from the Fund as of February 4, 2005. In accordance with the Act, the withdrawal liability of CPC was based upon the unfunded vested benefits liabilities of the Fund as of the end of the plan year preceding the date of withdrawal, in this case, the 2004 plan year. To assess withdrawal liability, the pools prior to the 1996 plan year were calculated based upon use of the Segal Blend. In accordance with the resolution, the withdrawal liability pools were calculated differently during the periods from 1996-99 and from 2001-03 than during the period prior to 1996 and subsequent to 2003. The pools from the 1996-99 plan years and the 2001-03 plan years were calculated using the plan's funding interest assumption, and not the Segal Blend. The pool for the 2004 plan year was calculated using the Segal Blend, but was distorted by the change in interest rate assumption. The effect of these determinations by the Trustees reduced the amount of those pools and any resulting withdrawal liability below that which would have been determined based upon use of the Plan's Actuary's best estimate for withdrawal liability purposes (i.e. the Segal Blend). It is this difference in calculations that is at the heart of the dispute.

## II. STANDARD OF REVIEW

In an appeal of a withdrawal liability arbitration, the arbitrator's factual determinations are reviewed under the "clearly erroneous" standard, whereas the arbitrator's legal conclusions are subject to *de novo* review. *Schlitz Brewery Co. v. Milwaukee Brewery Workers Plan*, 3 F.3d 994, 999 (7th Cir. 1993), *aff'd* 513 U.S. 414 (1995).

## III. DISCUSSION

Plaintiff puts forth three arguments as to why the arbitrator's award must be vacated. First, it argues that the arbitrator failed to apply the required legal standard. Second, it argues that the arbitrator incorrectly interpreted ERISA Section 4213 and the meaning of the phrase "on the basis of." Finally, it argues that the statute does not authorize the relief ordered for the harm identified by the Arbitrator. None of these arguments is persuasive.

### A. The Arbitrator Used the Correct Standard of Review

The Fund argues that the Arbitrator committed a legal error when he voided the plan's UVB determinations for the years in question without finding that the assumptions and methods used were unreasonable in the aggregate. Pursuant to section 4221(a)(3), an arbitrator must uphold a determination by the plan sponsor unless it is unreasonable or clearly erroneous:

> For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 4201 through 4219 and section 4225 is presumed correct unless the party contesting the determination shows by a preponderance of evidence that the determination was unreasonable or clearly erroneous.

ERISA § 4221 (a)(3)(A), 29 U.S.C. § 1401(a)(3)(A). With respect to a determination of the plan's UVB for a given year:

> The determination is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that:

>  (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or
>  (ii) that the plan's actuary made a significant error in applying the actuarial assumptions or methods.

ERISA § 4221 (a)(3)(A), 29 U.S.C. § 1401(a)(3)(B). Withdrawal liability calculations must meet the requirements of ERISA § 4213, which requires that the actuarial methods and assumptions represent the actuary's best estimate of anticipated experience:

> Withdrawal liability under this part shall be determined by each plan on the basis of (1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or (2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

ERISA § 4213(a), 29 U.S.C. § 1393(a).

Here, the Arbitrator found that the Fund's withdrawal liability determination was made on the basis of UVBs that were not based on assumptions and methods that offered the actuary's best estimate. This is a direct violation of ERISA. Because the withdrawal liability determination was calculated in violation of the statute, it was clearly erroneous, and the presumption created by ERISA § 4221 cannot apply. Contrary to the Fund's assertions, "reasonableness" is not the only consideration pursuant to § 4221(a)(3). Instead, "any determination made by a plan sponsor under section 1381 through 1399" is presumed correct unless it is shown to be *either* "unreasonable *or* clearly erroneous." 29 U.S.C. § 1401(a)(3)(A) (emphasis added). Similarly, a determination of UVBs is presumed correct under § 4221(a)(3)(B) unless the assumptions are unreasonable or "the plan's actuary made a significant error in applying the actuarial assumptions or methods." 29 U.S.C. § 1401(a)(3)(B).

7

The Fund ignores that the statutory presumption does not apply in the face of clear or significant error. Here, the Arbitrator found that the disputed withdrawal liability determinations were based upon UVBs calculated in violation of the statute, which is both "clearly erroneous" and "as significant error." Accordingly, the presumption does not apply, regardless of a finding of unreasonableness.

B. Arbitrator's Interpretation of ERISA Section 4213 was correct.

Next, the Fund challenges the Arbitrator's finding that it violated § 4213. Pursuant to this statute, withdrawal liability calculations must be determined by each plan on the basis of:

> (1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or (2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

ERISA § 4213(a), 29 U.S.C. 1393 § (a).

The Arbitrator found that the assumptions and methods used by the plan, pertinent to this calculation, did not represent the actuary's best estimate of anticipated experience, stating that the Fund's approach "suffers from the fatal defect of not representing the Plan Actuary's best estimate." Accordingly, the Arbitrator found the Fund in violation of the statute. The Fund maintains, however, that the language in § 4213 requires only that the "best estimate" assumptions and methods be a principal element of the calculations, "so that the calculation bears a reasonable relationship to those assumptions and methods." Additionally, it argues that the statute does not "prohibit the plan sponsor from modifying the actuary's assumptions, so long as the assumptions and methods ultimately used by the plan are reasonable in the aggregate."

8

### 1. Withdrawal Liability Was Not Calculated "on the basis of" the actuary's best estimate.

As noted *supra*, pursuant to the Trustee's resolution, the value of unfunded vested benefits for purposes of withdrawal liability was to be calculated using the Segal Blend (and "best estimate") assumptions, *unless* the value of the UVBs were higher than the value of the UVBs calculated when using the funding report assumptions. It is undisputed that the Fund applied this "cap" to the UVBs used to calculate withdrawal liability pools from 1996 until 2004. In years when the funding report assumptions produced lower UVBs than those calculated using the Segal assumptions, the funding report assumptions were used to calculate the UVBs that were the basis for that year's withdrawal liability pool. Such caps displaced the actuary's "best estimate" which was calculated using the Segal method.

The Fund's argument that the calculations made while utilizing the Trustees' cap still resulted in an assessment "on the basis of" the best estimate was rejected by the Arbitrator. The Arbitrator found that the actions of the Trustees violated Section 4213 because they determined the withdrawal liability using actuarial assumptions and methods that differed from the Plan Actuary's best estimate of anticipated experience under the Plan. The Arbitrator stated that the evidence was clear that the Segal Blend – without the cap – was the best estimate of the Plan Actuary of anticipated experience under the Plan for purposes of valuing the Fund's unfunded vested benefit liabilities for withdrawal liability purposes. Because the Trustees did not use the actuarial assumptions and methods which offered the actuary's best estimate, the Arbitrator held that the Fund violated Section 4213. Having found such a violation, the Arbitrator did not address the reasonableness of this method. ("It is not necessary to address the reasonableness of

9

the *Concrete Pipe* method which in a post hoc fashion selects different interest assumptions to value the Fund's unfunded vested benefit liabilities in a given year for withdrawal liability purposes based upon which yields the lower valuation.")

I find the Fund's contention that calculations using the capped UVB methodology were "based upon" the actuary's best estimate to be unavailing. Though UVB calculations might have been made using the Segal method, the resulting UVBs were not used to calculate the withdrawal liability. Instead, lower UVBs calculated using the funding report method were utilized. The Segal method represented the actuary's "best estimate," and the Fund does not dispute that using caps modified the Segal assumptions and methods. When the UVB calculated using the Segal assumptions was higher than the UVB calculated using the funding report assumptions, the funding assumptions were used. I am unconvinced that the Fund satisfies the statute simply because the Segal best estimate was an element of the calculation formula, or that the Segal best estimates and assumptions were reasonably related to the ultimate UVB calculation. Utilizing the funding report calculation was not merely an additional step, the choice to use the lower of two acceptable and reasonable UVB assumptions, but a decision to disregard the actuary's best estimate. The Trustees' use of the cap displaced the actuary's 'best estimate' calculations and constitutes an error in applying the actuarial assumptions described in the statute.

<u>2. The Statute Does Not Permit Modifications To the Actuary's Assumptions</u>.

The Fund also submits applying the assumptions and methods used to calculate the funding report to its UVB calculation for withdrawal liability is proper, so long as it does not modify the "best estimate" assumptions and methods used to calculate the funding report. This argument misses the point.

The Fund admits that withdrawal liability was determined using a formula other than the Segal Blend method, the actuary's best estimate. Though the Fund characterizes the Blend method as "a fundamental ingredient" and "starting point" for the UVB calculation for withdrawal liability, the fact remains that the Blend method was not used to calculate the UVB. Instead, a "modified" version was used – the funding report method. Despite the Fund's efforts to show how the Blend method was included in its UVB calculation, the Trustees overrode the actuary's best estimate in violation of § 4213, and in doing so, manipulated withdrawal liability.

The Fund is correct that the trustee, and not the actuary, determines the withdrawal liability. The trustee, however, must adhere to the provisions of the Act, including the requirements relative to the actuarial assumptions and methods used to determine the unfunded vested benefit liabilities of the Fund that underlay the withdrawal liability calculation. The Trustees here, however, ignored these provisions.

### C. The Arbitrator's Remedy Was Proper

Finally, the Fund argues that the Arbitrator erred by ordering relief unauthorized by the Act. Specifically, the Fund argues that an employer challenging withdrawal liability is "limited by a remedy which requires a specific category of misconduct – an unreasonable determination as specified in § 4221(a)(3)." This argument is unpersuasive.

Withdrawal liability issues fall soundly within an Arbitrator's authority to review under 29 U.S.C. § 1401(a)(1). Similarly, § 1401(d) vests the Arbitrator with the authority to issue required payments or other determinations consistent with his ruling. The Arbitrator correctly found that the Fund's withdrawal liability assessment to CPC was determined on the basis of seven pools improperly calculated in a matter that did not reflect application of the actuary's best estimate in violation of ERISA § 4213(a). As noted previously, this section is not only violated

11

if actuarial assumptions are unreasonable, but also when they do not offer the actuary's best estimate of anticipated experience under the plan, as was the case here. The result of the Fund's miscalculation was that CPC was assessed withdrawal liability that was calculated in a manner contrary to the statute. The Arbitrator's Award simply requires the Fund to calculate CPC's withdrawal liability in accordance with the law. Such an Award is within the Arbitrator's authority.

## IV. CONCLUSION

For the foregoing reasons, the Arbitrator's award is affirmed. The Fund's motion to vacate or modify the Arbitrator's award is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: August 8, 2011